# UNITED STATES DISTRICT COURT

_____SOUTHERN_____ District of __NEW YORK__

MOHAMMED INSHAN,

                Plaintiff(s),

- against -

GOLDMAN SACHS LONG TERM DISABILITY PLAN, and CONNECTICUT GENERAL LIFE INSURANCE COMPANY,

                Defendant(s).

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:

## 05 CV 9550

## JUDGE SCHEINDLIN

TO: (name and address of defendants)
GOLDMAN SACHS LONG TERM DISABILITY PLAN
c/o Plan Administrator
85 Broad Street, New York, NY 10004

CONNECTICUT GENERAL LIFE INSURANCE COMPANY
Two Liberty Place; 1601 Chestnut Street; Philadelphia, PA 19122

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY, (name and address)

BINDER & BINDER, P.C.
2805 Veterans Memorial Highway
Suite 20
Ronkonkoma, New York 11779

an answer to the complaint which is herewith served upon you, within __20__ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MCMAHON

CLERK

(BY) DEPUTY CLERK

NOV 1 4 2005

DATE

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
MOHAMMED INSHAN,

      Plaintiff,

  – against –

GOLDMAN SACHS LONG TERM DISABILITY PLAN,
and CONNECTICUT GENERAL LIFE INSURANCE
COMPANY,

      Defendants.
---------------------------------------------------------------X

Civil Action No.: 05 CV 9550

COMPLAINT

JUDGE SCHEINDLIN

RECEIVED NOV 14 2005

  Plaintiff, Mohammed Inshan, by his attorneys, BINDER & BINDER, P.C., for his Complaint against the Defendants, Goldman Sachs Long Term Disability Plan (the "LTD Plan"), and Connecticut General Life Insurance Company ("CGLI"), hereby alleges as follows:

### JURISDICTION AND VENUE

1.  Jurisdiction of the Court is based upon 29 U.S.C. §§ 1132(e)(1) and 1132(f) which give the District Courts jurisdiction to hear civil actions brought to recover benefits due under the terms of several employee welfare benefit plans. In addition, this action may be brought before this Court pursuant to 28 U.S.C. § 1331, which gives the District Court jurisdiction over actions that arise under the laws of the United States.

2.  Under the Employee Retirement Income Security Act of 1974 (hereinafter, "ERISA") (29 U.S.C. §§ 1001 *et seq.*), the employee welfare benefit plans at issue in this litigation must contain provisions for administrative or internal appeal of denial of benefits. Plaintiff has exhausted all administrative avenues of appeal and has received a final denial. This matter is properly before this court for *de novo* judicial review as there is no explicit grant of discretionary authority in accordance with Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989).

3.  Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) which allows an action under Title I of ERISA, as amended, to be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found.

## NATURE OF ACTION

4. This is a claim seeking a declaration that Plaintiff is entitled to continue receiving disability benefits pursuant to the terms and conditions of the Long Term Disability Policy.

5. Defendant, the LTD Plan, provides group long term disability ("LTD") benefits, sponsored and funded by Goldman, Sachs & Company ("Goldman Sachs"). The LTD plan is an employee welfare benefit plan established and maintained by an employer or employee organization for the benefit of its employees. As such, ERISA applies to this action. The LTD Plan was effective at all times relevant hereto.

6. Claims for LTD benefits are administered pursuant to an insurance policy issue to Goldman Sachs by CGLI. CGLI has made all claims decisions in this matter.

## THE PARTIES

7. Plaintiff was born on December 10, 1948, is presently 56 years old, and is a resident of Queens, New York.

8. Defendant, the LTD Plan, is an employee welfare benefit plan, as defined by ERISA, and its terms and benefits are the subject matter of this action. The LTD Plan is sponsored and funded by Goldman Sachs for the benefit of its employees. The LTD Plan's designated agent for service of process is the Plan Administrator, located at 85 Broad Street, New York, NY 10004.

9. Defendant, CGLI, is a Connecticut corporation licensed to conduct the business of insurance in New York State. CGLI's address is Hartford, Connecticut 06152. Upon information and belief, the address listed by CGLI with the New York State Insurance Department is Two Liberty Place, TL18A, 1601 Chestnut Street, Philadelphia PA 19192-2362.

10. Upon information and belief, CGLI is both the Claims Administrator and the insurer for the LTD Plan.

## STATEMENT OF FACTS

**Plaintiff's Occupation:**

11. Plaintiff worked for Goldman Sachs for eight and one-half (8 ½) years as a Records Clerk, until October 1998.

12. Plaintiff had a physically demanding and stressful occupation. According to the job description provided by Goldman Sachs, Plaintiff's position required that he:

- Retrieve records and files from a warehouse location and deliver them to authorized personnel.
- File incoming records to assigned locations.
- Pack general files at year-end storage.
- Perform data entry.

13. Plaintiff's pre-disability income was approximately $28,000 per year.

**The Terms of the LTD Plan:**

14. The LTD Plan provides for payment of monthly income benefits to participants of the LTD Plan who become totally disabled.

15. In the LTD Plan, the term "Total Disability" or "Totally Disabled" is defined as follows:

> You will be considered Totally Disabled if, because of an Injury or Sickness, you are unable to perform all the essential duties of your occupation.
>
> After monthly benefits have been payable for 30 months you will be considered Totally Disabled only if, because of Injury or Sickness, you are unable to perform all the essential duties of any occupation for which you are or may reasonably become qualified, based on your education, training or experience.

16. The monthly benefit to be paid under the LTD Plan is determined based on a set percentage of pre-disability eligible compensation, and is reduced by other income benefits, as these terms are identified in the LTD Plan. These other income benefits include Social Security disability benefits. Thus, both the LTD Plan and CGLI realize a direct financial benefit from a claimant's receipt of Social Security disability benefits.

17.     Moreover, CGLI and the LTD Plan actively enforce this financial benefit by requiring the claimant to apply for Social Security disability benefits and, in the absence of same, by imposing a penalty, in the form of a reduction of the LTD benefit for estimated Social Security disability benefits, even if the claimant is <u>not</u> receiving those benefits.

18.     With respect to the commencement of benefits, the LTD Plan provides: "You will qualify for the monthly benefit after you have completed the Benefit Waiting Period." The LTD Plan provides that the Benefit Waiting Period is equal to six (6) months of Total Disability. In Plaintiff's case, this period ended on April 29, 1999, with LTD benefits payable that day.

**Plaintiff's Disability:**

19.     The primary basis for Plaintiff's LTD claim is his severe orthopedic conditions in his neck and lower back, the severity of which is amply documented by his treating physicians.

20.     These injuries were so severe that Plaintiff was forced to undergo a spinal fusion at level C6/C7 in June 1998. This spinal fusion greatly decreased Plaintiff's Range of Motion in his neck.

21.     Since Plaintiff's conditions are degenerative, they continued to deteriorate until he was unable to return to work after October 30, 1998.

22.     Plaintiff's treating physicians diagnosed him with cervical spondylosis at C6/C7 with facet joint narrowing, osteoarthritic spurring of the facet joints at C4-C6, sciatica of the upper and lower extremities, and pseudoarthritis.

23.     According to Mr. Insham's treating physicians, he experiences painful, debilitating symptoms, including:

   a.   Neck and back pain, rendering him unable sit or stand for long periods of time.
   b.   Neck and back pain that prevents him from sleeping.
   c.   Weakness in his upper extremities.
   d.   Tenderness and spasms along his spine.
   e.   Persistent numbness in his arms and legs.

24.     Mr. Insham's symptoms continue despite various and continuous treatment, including trigger point injections of strong prescription pain medication given to alleviate his pain.

25. Mr. Insham's conditions and symptoms are exacerbated by the fact that he suffers from serious cardiac conditions including: significant stenosis of the left main coronary artery, two vessel coronary artery disease, mild diffuse left ventricular dysfunction, and elevated left ventricular end diastolic pressure.

26. Plaintiff also suffers from a variety of other ailments that further exacerbate his physical condition, including Fibromyalgia, Asthma, Gastoesophageal Reflux Disease ("GERD"), Irritable Bowel Syndrome ("IBS") and Diabetes.

27. As a result of these conditions, Plaintiff experiences severe, debilitating symptoms that have a marked negative impact on his ability to function in any environment, especially a normal work environment.

28. As a result of Plaintiff's physical condition, he is incapable of working in even a sedentary occupation.

29. Due to his debilitating physical conditions, Plaintiff has not worked in any gainful employment since October 30, 1998.

30. Plaintiff has received, and continues to receive, appropriate medical treatment for his numerous medical conditions from his primary care physician and appropriate treating specialists.

### PLAINTIFF'S FIRST CAUSE OF ACTION FOR LONG-TERM DISABILITY BENEFITS

31. On or about October 30, 1998, Plaintiff could no longer tolerate his multiple medical conditions, and he was unable to continue working on a full-time, or even a part-time, basis. Plaintiff was, thereby, rendered totally disabled as defined by the LTD Plan. Plaintiff continues to be so disabled.

32. As a result of his disability, Plaintiff timely filed a claim for benefits pursuant to the LTD Plan. With his claim, Plaintiff submitted overwhelming medical evidence of his complete inability to perform his prior occupation of Records Clerk for Goldman Sachs. Due to this

overwhelming evidence, CGLI initially improved Plaintiff's claim and paid benefits pursuant to the terms of the LTD Plan.

33. Plaintiff continued receiving LTD benefits, without interruption and without any amelioration of his disabling conditions, until CGLI terminated his benefits. This termination was communicated to Plaintiff in a letter from CIGNA (CGLI's parent company), dated November 7, 2001. This letter advised Plaintiff that it would be terminating his benefits under the LTD Plan as of January 5, 2002.

34. In the letter, CGLI claimed that Plaintiff no longer met the criteria for "Total Disability" as defined by the LTD Plan.

35. It is interesting to note that Plaintiff's benefits were paid for approximately thirty-four (34) months, which was just slightly longer than the "own occupation" period of Total Disability defined by the Plan.

36. As the LTD Plan states, the definition of Total Disability changes after thirty (30) months of benefits have been paid. The definition changes from the "own occupation" definition to the "any occupation" definition. *(See definition of Total Disability in Parag. 14, above).*

37. CGLI planned to, and did, take advantage of this change in definition to fabricate grounds upon which to terminate Plaintiff's benefits, despite overwhelming medical evidence from his multiple treating physicians, who all agreed that Plaintiff was incapable of working in any capacity.

38. For this purpose, CGLI required Plaintiff to submit to a Functional Capacities Evaluation ("FCE"), which is a one-day series of tests performed by a physical therapist, supposedly to provide an objective measurement of a claimant's current level of function as it relates to his/her ability to work.

39. This FCE was scheduled for May 17, 2001. It was performed by Sports Physical Therapy of New York on that date.

40. CGLI received the FCE Report on May 23, 2001.

41. Despite CIGNA's malicious intention to terminate Plaintiff's LTD benefits, the results of the FCE clearly showed that Plaintiff met the criteria for total disability under the "own

occupation" definition. As a result, despite receiving the FCE Report on May 23, 2001, CGLI was unable to use the specious results thereof as basis to terminate Plaintiff's LTD benefits until <u>after</u> it had paid 30 months of benefits and engendered the change in definition to "any occupation." This is why GCLI waited until November 7, 2001 to send Plaintiff it's denial letter, and why CGLI agreed to continue paying LTD benefits until January 5, 2002 (amounting to roughly 34 months of paid LTD benefits).

42. However, by November 7, 2001 – which is, conspicuously, just a few days after the change in definition, which occurred on or about October 29, 2001 – CGLI was obviously ready and willing to use the specious results of the FCE as a basis to terminate Plaintiff's benefits.

43. The decision to terminate Plaintiff's claim, especially in light of the pinpoint timing of the November 7, 2001 letter, was absolutely arbitrary, and it was done solely for CGLI's financial gain.

44. The results of the FCE were specious and utterly unreliable for various reasons.

45. First, a medical examination and evaluation must be performed prior to the actual FCE testing, and said evaluation is part of the FCE Report. However, in the context of an FCE, the **medical** examination and evaluation are performed by a physical therapist – not a physician. Obviously, the conclusions of the physical therapist are totally inadequate, when opposed to the multiple prior physical examinations and evaluations performed by Plaintiff's four (4) treating physicians – the results of which all contradicted the conclusions of the physical therapist by showing significantly greater physical limitations.

46. Second, the testing methods and procedures used during the FCE were, themselves, flawed and entirely too cursory to be probative, or even indicative, of Plaintiff's ability to work. As noted above, the FCE was performed in one day, as opposed to the many days of examination and evaluation performed by Plaintiff's multiple treating physicians.

47. Third – and most important – the ultimate conclusion given by the physical therapist to justify their conclusion that Plaintiff had sufficient work capacity was utterly conclusory, totally prejudicial to Plaintiff, and completely devoid of factual basis according to Plaintiff's testing.

48. Specifically, the FCE Report concludes: "At this time, Mr. Inshan displayed the ability to function in the Light Physical Demand Level for a period of 8 hours **secondary to his inconsistent effort throughout testing.**" *(emphasis added)*

49. In other words, the physical therapist was admitting that they did not base the determination on their inadequate medical examination and evaluation. Nor did they base their determination on the actual results of the cursory testing. Instead, the physical therapist determined that Plaintiff had the capacity to perform past even the Sedentary Physical Demand Level – to the Light Physical Demand Level – based solely on their opinion that Plaintiff gave sub-maximal effort. It is appalling that a test ostensibly designed to give an objective measure of a claimant's work capacity reached its ultimate conclusion based solely on pure conjecture.

50. The physical therapist's opinion was conclusory and totally prejudicial to Plaintiff. But moreover, this opinion is absolutely contradicted by the FCE Report, itself. Specifically, the FCE Report states that, throughout testing, Plaintiff experienced severe pain and dizziness, and that he experienced severe shortness of breath, for which he had to use his asthma inhaler.

51. Additionally, the Range of Motion ("ROM") testing performed during the FCE showed that Plaintiff's cervical ROM results – particularly those involving cervical extension, left lateral flexion and bilateral rotation – deviated from normal ROM **by 40 - 76 %.**

52. The FCE Report also erroneously indicates that, during an eight hour workday, Plaintiff has the ability to frequently sit, stand, and walk, ranging up to five and one half (5 ½) hours. This is a baseless assumption, since there is nothing in the results of the FCE that would indicate Plaintiff's ability to perform these activities for such a time frame. The FCE can only predict the amount of time Plaintiff can perform these activities for the amount of time they were performed, without pain, during the FCE. Plaintiff was not asked to perform each of these activities for 5 ½ hours during the exam, so the conclusion that he is capable of such is unreasonable.

53. More importantly, the FCE could not have hoped to show that Plaintiff could work an 8 hour day at even Sedentary exertion level, since this would require that he be able to sit for a total of **at least** six (6) hours per day in an 8 hour workday.

54. The FCE is even more unreliable in assessing whether Plaintiff met the definition of Total Disability on the LTD Plan, because of its utter inadequacy in establishing Plaintiff's ability to fully perform any occupation over an 8 hour workday.

55. Specifically, after 30 months, the LTD Plan definition of Total Disability requires that the claimant be "unable to perform **all the essential duties** of any occupation for which you are or may reasonably become qualified, based on your education, training or experience." Not only does this definition force a narrow consideration of Plaintiff's learned transferable skills – it also requires a very narrow consideration of the effect of each of Plaintiff's symptoms on his ability to perform **each and every essential duty** of any proposed occupation. It is clear that Plaintiff's symptoms would prevent him from working a full 8 hour day and also prevent him from performing specific duties essential to almost every occupation (*i.e.* maintaining a static body and neck position for the requisite time to accomplish assigned tasks).

56. To follow up on this specious FCE, CGLI performed a Transferable Skills Assessment ("TSA"), which ostensibly identified the other occupations, which Plaintiff would be capable of performing, based on his education, training and experience. However, the sole medical basis for the TSA was the flawed FCE, which was based on the utterly inadequate medical evaluation and examination performed by the physical therapists, while completely ignoring the determinations of Plaintiff's multiple treating physicians. Therefore, the TSA is totally unreliable.

57. CGLI's denial letter, dated November 7, 2001 relied solely on the inaccurate FCE Report, despite the fact that even a valid one-day FCE would have been an inadequate means by which to challenge the concurrent determinations of claimant's **multiple** treating physicians that he is totally disabled from **any** occupation.

58. We note that CGLI's letter also mentioned the TSA performed after the FCE. However, the TSA is fruit of a poisonous tree, for the reasons described above.

59. CGLI's denial letter did not contain **one single** reference to any of the medical documentation provided by Plaintiff's four (4) treating physicians, who all agreed that Plaintiff was completely unable to perform any occupation.

60. Among the voluminous medical documentation that CGLI completely ignored in its letter of November 7, 2001 were various extremely important, and probative, medical records from four (4) of Plaintiff's treating physicians, who all determined that Plaintiff was totally incapable of performing any occupation.

61. Although much of this medical evidence was provided in the form of treatment notes and narrative reports, Plaintiff's physicians also provided Physical Abilities Assessments ("PAA's") nearly identical in form to the erroneous PAA that documents the inadequate medical examination and evaluation provided by the physical therapists who performed the FCE. However, while these PAA's may be identical in form, they are markedly different in substance.

62. In a PAA completed on March 22, 2000, by William Lichtenfeld, M.D., Plaintiff's Pain Management and Rehabilitation Specialist, it is indicated that Plaintiff should **never** climb, stoop, crouch, crawl, push, pull, lift more than 10 pounds or carry more than 10 pounds during an eight hour workday. Dr. Lichtenfeld further noted that Plaintiff could sit for a maximum of four (4) hours per 8 hour workday with frequent breaks, and that he could stand or walk for a maximum of two (2) hours in an 8 hour workday with frequent breaks.

63. In a PAA completed on January 28, 2001, by Debbie Sonnenblick, M.D., Plaintiff's Primary Care Physician, it is indicated that Plaintiff should **never** attempt to lift, carry, push, pull, climb, stoop, kneel, crouch, crawl or reach for any period of time, during an eight hour workday. Dr. Sonnenblick further indicated that even activities such as sitting, standing and walking could only be done occasionally (less than 2.5 hours in an 8 hour day) – but not continuously.

64. In a PAA completed on February 7, 2001, by Jeffrey Goldstein, M.D., one of Plaintiff's Orthopedists, it is indicated that Plaintiff should **never** attempt pushing, pulling, kneeling, crouching, crawling, lifting more than 20 pounds or carrying more than 20 pounds during an eight hour workday. Dr. Goldstein further indicated that activities such as sitting, standing, walking, climbing, balancing, stooping, and reaching overhead could only be done occasionally.

65. In a PAA completed on January 9, 2001, by Dr. Sheldon Schwartz, Plaintiff's Rheumatologist, it is indicated that Plaintiff should **never** attempt climbing, stooping, crouching, crawling, lifting more than 10 pounds or carrying more than 10 pounds during an eight hour

workday. Based on his diagnosis of Fibromyalgia, Dr. Schwartz further indicated that the Plaintiff could push and pull up to 10 pounds or kneel only occasionally during an eight hour workday, and that he could sit, stand or walk frequently in an 8 hour workday (2.5 to 5.5 hours per 8 hour day).

66. These PAA's completed by the Plaintiff's treating physicians clearly contradict the one completed by the physical therapists overseeing the FCE. Given the immeasurably greater amount of experience these physicians have, both in medical terms and in time with Plaintiff, it is clear that their opinions should be accorded much greater weight than that of the physical therapists.

67. Moreover, the PAAs completed by Plaintiff's physicians more accurately reflect the results of the FCE, which showed Plaintiff experiencing severe pain, dizziness and shortness of breath during testing. These results clearly indicate that Plaintiff functions at a level well below that needed for the performance of even sedentary work over an 8 hour day.

68. Sedentary work capacity requires, at the very least, that Plaintiff can sit for at least six (6) hours in an 8 hour workday. Even the suspect PAA completed by the physical therapists indicated that Plaintiff could sit for only 5 ½ hours in an 8 hour workday.

69. After receiving CGLI's November 7, 2001 letter, Plaintiff's counsel timely appealed the adverse decision and submitted additional probative medical documentation from Plaintiff's various treating physicians. Along with this medical documentation, Plaintiff's counsel submitted a twelve (12) page comment letter, specifically detailing the reasons why CGLI's termination of benefits was erroneous.

70. Among the additional documentation submitted with Plaintiff's appeal were ample medical records dated after the completion of the FCE. These records provide further support for the clear opinions of Plaintiff's treating physicians that he continued to be totally disabled from any occupation after January 5, 2002. If anything, these records show that Plaintiff's disability actually became more profound, due to the continuity of his chronic symptoms and the overall degenerative nature of his conditions.

71. With regards to Plaintiff's orthopedic condition, which is the primary cause of his disability, the medical records indicate a degeneration in his lumbar spine (low back) such that he had developed osteopenia, as shown on a Bone Densitometry Study in February 2001.

72. Also with regard to Plaintiff's orthopedic condition, Dr. Schwartz's notes clearly indicate that Plaintiff continued to be disabled after January 5, 2002.

73. On January 15, 2002 Dr. Schwartz noted that Plaintiff suffered from pain in his neck, back, both shoulders, and both hands, as well as fatigue and leg cramps.

74. On March 7, 2002 and May 9, 2002 Dr. Schwartz noted the persistence of similar symptoms.

75. On May 23, 2002 Dr. Schwartz noted an improvement in Plaintiff's condition.

76. On June 13, 2002 Dr. Schwartz noted the Plaintiff's symptoms had returned.

77. On June 27, 2002 Dr. Schwartz noted some symptomatic relief from facet injections.

78. On July 11, 2002 Dr. Schwartz noted that Plaintiff's symptoms were much worse, with Plaintiff experiencing pain radiated through his whole body.

79. It is important to note that Plaintiff's condition steadily exacerbated, despite receiving continuous treatment, and despite avoiding work, or any strenuous activity, altogether.

80. However, in addition to his prior conditions, Plaintiff also developed a progressively worsening cardiac condition, for which he received medical treatment from Subrahmanya K. Bhat, M.D. Medical evidence of this cardiac condition was provided to CGLI with Plaintiff's appeal.

81. With regards to Plaintiff's cardiac condition, Dr. Bhat's notes clearly indicate that Plaintiff's cardiac condition had gotten much worse, and that it rendered him totally disabled by itself – without consideration of his orthopedic conditions.

82. It is important to note that Plaintiff had suffered severe and frequent dizziness during the FCE. This dizziness could have been caused by Plaintiff's cardiac insufficiency.

83. On August 8, 2002 Dr. Bhat ordered a coronary angiogram after Plaintiff began experiencing chest pain with increased frequency.

84. On August 22, 2002 the coronary angiogram was performed along with a left heart catheterization, left ventriculography, a bypass graft study, and an aortic root aortogram. Based on the results of these test, Dr. Bhat recommended a coronary angioplasty and that a stent be inserted.

85. On September 6, 2002 Dr. Bhat wrote that Plaintiff was **"totally disabled due to his cardiac status and is likely to remain disabled given his propensity for repeated coronary stenosis."** *(Emphasis added)*

86. Plaintiff also has various other medical conditions that have shown a proclivity for exacerbation. These conditions greatly contribute to Plaintiff's continuing total disability.

87. On April 23, 2002 Dr. Umila Shivaram, Plaintiff's Pulmonologist, noted that Plaintiff's asthma (which had manifested during the FCE) had progressed to the point of severe wheezing and coughing.

88. Despite all of this evidence, and the 12 page appeal letter from Plaintiff's attorney, CGLI upheld its previous denial of the LTD claim. CGLI conveyed it's appeal denial decision by letter, dated November 15, 2002. This letter was also on CIGNA letterhead.

89. This time, CGLI based its decision on the opinion of one physician, who it had personally selected to perform a record review of Plaintiff's claim file. This physician **never** examined Plaintiff nor spoke to him. Nor did he ever speak to any of Plaintiff's multiple treating physicians.

90. In fact, the physician selected by CGLI was only asked to do one thing, and that was to provide his imprimatur to the denial decision already made by CGLI.

91. Upon information and belief, this physician routinely provides this type of service for Insurers, and even testifies before Worker's Compensation Boards on behalf of Insurers.

92. CGLI knew that this physician would contradict the multiple concurrent medical opinions of Plaintiff's four (4) treating physicians, who all agreed that Plaintiff was disabled from any occupation. In fact, they chose this particular physician for this specific reason.

93. After Plaintiff's appeal, CGLI was forced to acknowledge how terribly inadequate the FCE Report was in contradicting the opinions of Plaintiff's four (4) treating physicians. As a result, CGLI was forced to bolster it's fabricated grounds for denial by obtaining a report from a physician who they knew would ratify, without question, their ready-made decision to deny the claim. This physician did exactly what CGLI asked of him.

94. Since the record review by this physician was yet another unfair tactic used by CGLI to manufacture grounds for their denial of the LTD claim (just as was the specious FCE Report) it, too, shows how prejudicially, arbitrarily and capriciously CGLI administered this LTD claim.

95. CGLI's letter of November 15, 2002 served as the final denial of Plaintiff's LTD claim and marked the exhaustion of Plaintiff's administrative remedies under ERISA. Therefore, Plaintiff has been forced to commenced this action to address the repeated, arbitrary and medically erroneous denials of his claim. Accordingly, Plaintiff makes the within Complaint.

96. Plaintiff was and remains totally disabled within the terms and conditions of the LTD Plan, since the onset of his disability on October 30, 1998. Plaintiff is, therefore, entitled to the receipt of monthly LTD benefits from the date CGLI wrongfully terminated his benefits – January 5, 2002 – to the present day.

### PLAINTIFF'S SECOND CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTIES

97. Plaintiff repeats and re-alleges the allegations contained in the Paragraphs number "1" through "96," as if fully set forth herein.

98. Defendant, the LTD Plan, has breached its fiduciary duties by allowing CGLI to render all decisions on Plaintiff's claim for benefits, despite CGLI's obvious conflict of interest and biased handling of this claim.

99. Defendant, the LTD Plan, has breached its fiduciary duties by failing to properly monitor the actions of CGLI and by failing to correct the biased and inequitable handling of Plaintiff's claim.

100. Defendant, CGLI, breached its fiduciary duties by failing to render a fair and impartial decision on Plaintiff's claim for benefits under the LTD Plan, and by rendering its adverse decisions in favor of its own financial self-interest.

101. Plaintiff is entitled to equitable relief against CGLI and the LTD Plan, as a consequence of the Defendants' knowing and intentional breach of their respective fiduciary duties.

WHEREFORE, Plaintiff respectfully requests the following relief:

a. That the Court declare and then determine that under the terms of the LTD Plan that the Plaintiff's disability began on or about October 30, 1998, and that he continues to be disabled within the LTD Plan's provisions, through January 5, 2002 and continuing to the present day;

b. That, after making such a determination, the Court grant Plaintiff appropriate legal and equitable relief, and order Defendants, the LTD Plan and CGLI, to compensate Plaintiff, in accordance with the terms of the LTD Plan, for the LTD benefits owed from January 5, 2002 to the present.

c. That the Court determine and declare that, Defendant, CGLI, has knowingly and intentionally breached its fiduciary duties with respect to its administration of the LTD Plan, and grant Plaintiff appropriate equitable relief;

d. That the Court determine and declare that the LTD Plan, as Plan Administrator, by its failure to monitor and take corrective actions against CGLI, has breached its fiduciary duties with respect to its administration of the LTD Plan, and grant Plaintiff appropriate equitable relief;

e. That the Court award Plaintiff his attorneys' fees pursuant to ERISA, 29 U.S.C. § 1132(g); and

f. That Plaintiff receive such other necessary, proper and equitable relief, including interest, costs and disbursements, as to which he may be entitled.

Dated: November 10, 2005
Ronkonkoma, New York

**BINDER & BINDER, P.C.**

By: _____
Harry J. Binder (HJB 5450)
Attorneys for Plaintiff
2805 Veterans Memorial Highway
Suite 20
Ronkonkoma, New York 11779-7682
Telephone: (631) 361-6699
Facsimile: (631) 607-2569